# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| **IRREVOCABLE TRUST of ANTHONY J. ANTONIOUS,** | Civil Action No. 11-cv-06327 (KM) |
| **Plaintiff,** | |
| **v.** | **OPINION [Redacted Version]** |
| **NIKE, INC.** | |
| **Defendant.** | |

## MCNULTY, District Judge

The plaintiff says that it invented a better golf club head, and that the defendant copied its idea. Plaintiff (the "Trust") represents the interests of Anthony Antonious, now deceased, an inventor of golf equipment. The Trust now owns Antonious's U.S. Patent No. 5,735,754 for an Aerodynamic Wood Golf Club Head (the " '754 Patent"). The Trust alleges that the defendant, Nike, Inc., has infringed the '754 Patent by manufacturing and selling "various drivers, hybrids and fairways woods sold under the name SQ DYMO, and other[s] ... principally during the 2008-2010 period." Complaint, ECF no. 1 ("Cplt.") ¶ 13. I held a *Markman*[1] hearing (ECF no. 52) and, on January 8, 2014, I entered an Order and Opinion construing five disputed terms contained in Claims 1 and 9 of the '754 patent. (ECF nos. 54, 55) Discovery ensued.

Now before the Court is Nike's motion pursuant to Fed. R. Civ. P. 56 for summary judgment of noninfringement. (ECF no. 100) The motion focuses on a single disputed term: "aerodynamic configuration." For the reasons expressed herein, I will grant Nike's motion.

---

[1]   *See Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 976–79 (Fed. Cir. 1995) (en banc), *aff'd,* 517 U.S. 370, 116 S. Ct. 1384 (1996).

## I.   Background

I write for the parties and so assume familiarity with my *Markman* Opinion (ECF no. 54), which discussed at length the claims of the patent, the prosecution history, and the legal standards governing the construction issues. I highlight some matters that are particularly pertinent here.

### A.   Procedural History

The '754 patent[2] is for a golf club head having a "c-shaped aerodynamic configuration formed in the bottom surface adjacent a rear surface and having an open end extending forwardly toward the ball striking face" of the club head. According to the patent, "[t]his aerodynamic surface reduces undesirable air turbulence which causes aerodynamic drag and creates a smoother, laminar

---

[2]   I have abbreviated the most frequently cited record items thus:

'754 Patent  = Original '754 patent, Complaint Ex. A, also at ECF no. 101-1

'754 Reexamination certificate = January 2010 certificate of reexamination of '754 patent, Complaint Ex. B, also at ECF no. 101-1.

'149 Patent = U.S. patent no. 8,932,149, dated January 13, 2015, Winfield Decl. Ex. B, ECF no. at 109 at 21

Battelle Rpt. = Report dated March 14, 2013, "Test Results from Testing Golf Clubs in a Wind Tunnel," ECF no. 101-8

Guerrieri Tr. = Deposition transcript of the Trust's Rule 30(b)(6) witness, Carol L. Guerrieri, ECF no. 101-6

Long Tr. = Deposition transcript of Clayton Long, ECF no. 101-5

Long Rbtl. Rpt. = Rebuttal expert report of Clayton Long, ECF no. 101-7

Nike Br. = Defendant Nike's brief in support of summary judgment motion, ECF no. 100

Nike Reply Br. = Nike's reply brief in support of summary judgment motion, ECF no. 111

NSMF = Defendant Nike's statement of undisputed material facts, ECF no. 100-2

Trust Br. = Plaintiff the Trust's brief in response to summary judgment motion, with attached exhibits, ECF no. 108

TSMF = Plaintiff the Trust's response to statement of undisputed material facts, ECF no. 108 at 22

Winfield Decl. = Declaration, with exhibits, dated June 24, 2015, ECF no. 109

Winfield Tr. = Deposition transcript of Douglas Clay Winfield, ECF no. 101-4.

type air flow around the golf club head," and "result[s] in a more stable club head with higher speed for a given application of swing force by the golfer."

Claim 9, added on reexamination, is the only claim asserted by the Trust. Claim 9 requires, *inter alia,* an "aerodynamic configuration ... in the form of a c-shaped slot." In context, that term reads as follows:

> An aerodynamic golf club head including a club head body having a heel, toe, rear surface, ball striking face, upper surface and bottom surface, in which the improvement comprises:
>
>> an aerodynamic configuration within, and substantially parallel to, said bottom surface, adjacent said rear surface, in the form of a c-shaped slot having an open end facing forwardly toward said ball striking face, said slot offset from, and a portion thereof passing through, a virtual centerline passing transversely through a heel-to-toe axis of said club head.

('754 Reexamination certificate).

Before the *Markman* hearing the parties submitted a joint statement including disputed and undisputed claim terms. (ECF no. 35) The parties agreed as to the construction of the claim term "aerodynamic configuration":

| Claim No. | Claim Term | Claim Construction Upon Which Parties Concur |
|---|---|---|
| 1, 9 | Aerodynamic configuration | ***aerodynamic configuration*** means an aerodynamically efficient configuration which minimizes turbulence, reduces drag, and increases laminar flow around the club head when swung. |

(ECF no. 35 at 8 (excerpt from Ex. A, "Construction of Agreed Upon Claim Terms Pursuant to L. Pat. R. 4.3(a)"))

Fact discovery closed on February 25, 2015. (ECF no. 80) Expert discovery closed on May 7, 2015. (ECF no. 82)

## B.    This Motion & The Trust's Amended Papers

The parties agreed on the efficacy of an initial summary judgment motion focused on the single issue of whether NIKE's accused golf club heads possess the claimed "aerodynamic configuration." (ECF nos. 95, 96). The accused clubs

3

are Nike's SQ DYMO driver, SQ DYMO Quad Keel fairway wood, SQ DYMO STR8-Fit driver, SQ DYMO2 driver, SQ DYMO2 Quad Keel fairway wood, and SQ DYMO2 STR8-Fit driver. (NSMF ¶ 4; TSMF ¶ 4)

The motion was fully briefed. After Nike submitted its reply brief, however, the Trust belatedly filed an "amended" or "corrected" set of papers. (ECF nos. 113, 114, 117) The Trust did not seek leave to file such papers. I will not consider these submissions, filed without leave and without an opportunity for Nike to respond. I will entertain a timely, succinct motion for reconsideration in which the Trust states its reasons for not submitting this material earlier. Nike will have a fair opportunity to respond, both to that motion and to any new material in these supplemental papers.

## II.   Summary Judgment Standard

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there is a dispute as to any material fact, "[a]ll inferences must be drawn in favor of the non-moving party." *Donnelly Corp. v. Gentex Corp.*, 168 F.3d 1322, (Fed. Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986)).

The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S. Ct. 2548, 2552–53 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof … the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S. Ct. at 2554. Here, an accused patent infringer seeks summary judgment of noninfringement. In that context, the movant "may meet its initial responsibility either by providing evidence that would preclude a finding of

4

infringement, or by showing that the evidence on file fails to establish a material issue of fact essential to the patentee's case." *Novartis Corp. v. Ben Venue Labs., Inc.*, 271 F.3d 1043, 1046 (Fed. Cir. 2001).

Once the moving party has met that threshold burden, "the non-movant must come forward with sufficient evidence to show that, on the non-movant's evidence, the movant is not entitled to judgment as a matter of law." *Arkie Lures, Inc. v. Gene Larew Tackle, Inc.*, 119 F.3d 953, 955 (Fed. Cir. 1997) (citing *Celotex*, 477 U.S. at 322–24, 106 S. Ct. at 2552–53). To make that showing, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita*, 475 U.S. at 586, 106 S. Ct. at 1356. The non-moving party must present evidence sufficient to create a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248–49, 106 S. Ct. at 2510–11; *see also* Fed. R. Civ. P. 56(c) (listing materials to be considered).

## II.   Discussion

Literal infringement, the claim here, requires that the accused product include "each and every limitation of the claim, and if even one limitation of the patent claim is missing from the accused product, there is no infringement." *Mas-Hamilton Grpl. v. LaGard, Inc.*, 156 F.3d 1206, 1211 (Fed. Cir. 1998). As to infringement, the ultimate burden of proof is upon the patentee. *Medtronic, Inc. v. Mirowski Family Ventures, LLC*, __ U.S. __, 134 S. Ct. 843, 849 (2014); *Novartis,* 271 F.3d at 1046.

"Consideration of whether a patent claim is infringed involves a two-step process: First, construing the claim language in dispute, and second, comparing the construed language to the accused process." *PC Connector Solution LLC v. SmartDisk Corp.*, 406 F.3d 1359, 1362 (Fed. Cir. 2005). The "claim language" at issue is the term "aerodynamic configuration." As to the construction of that term, the parties agree: it means a configuration that "[1] minimizes turbulence, [2] reduces drag, and [3] increases laminar flow around

the club head when swung." (NSMF ¶ 3; Trust Br. at 3)(numbering added). Thus the task before the Court is to compare that "aerodynamic configuration" claim language to the six accused Nike golf club heads.

### A.   The Trust's "Competitive" Standard

To refer to minimization of turbulence, reduction of drag, and an increase of laminar flow, is to beg a fundamental interpretive question: "minimizes," "reduces," and "increases" in relation to what? A club head with no c-shaped slot at all? A slot shaped like another letter of the alphabet? Prior art generally? The patent does not say.

To arrive at a standard favorable to its claims, the Trust first attempts to clear a space in which to maneuver. "Aerodynamic configuration," says the Trust, is a "subjective" term. "Turbulence," "drag," and "laminar flow" are not the subject of "accepted standards." It follows, says the Trust, that the test should be "whether the DYMO's 'aerodynamic configuration' was better, worse or comparable to that of its competition." If better, says the Trust, then Nike's accused club heads must possess the "aerodynamic configuration" claimed by the '754 patent. (Trust Br. at 3, 10).

I am dubious of the Trust's suggested "competitive" standard. I see two threshold problems with it.

First, the parties long ago agreed on the construction of the term "aerodynamic configuration." Any remaining vagueness or lack of "accepted standards" must fall on the Trust. From the patent holder's point of view, the vagueness of a patent is a flaw, not an opportunity for expansion. All parties engaged in the *Markman* process in reliance upon the statement of terms agreed upon. I will not reopen these interpretive issues.

Second, it cannot be correct that every club head with a c-shaped slot infringes if the *club head,* as a whole, happens to be aerodynamically superior to its competitors. Surely many factors, apart from the c-slot, influence the aerodynamic qualities of a club head. If Nike made a club head 1 millimeter thick and coated with graphite, it might prove to be aerodynamically superior (although useless for hitting a golf ball). That would say nothing about the

aerodynamic qualities of the c-slot. In short, the Trust's "competitive" standard is overinclusive, and therefore a poor proxy for the aerodynamic configuration term.

I hold that Claim 9 does not speak to an aerodynamic configuration of the club head generally; it specifies an "aerodynamic configuration ... *in the form of a c-shaped slot.*" It is the c-shaped slot, not the club head as a whole, that must minimize turbulence, reduce drag, and increase laminar flow around the club head. That interpretation dispels many of the Trust's proffered issues of fact—*i.e.,* it renders them immaterial.

**B.    Winfield expert opinion testimony**

Nike asserts that the Trust introduced no fact testimony on the subject of the aerodynamic configuration. The Trust does not seem to disagree.

As for expert witnesses, Nike quotes the Trust's own expert, Douglas Winfield. In his deposition, Winfield admitted that the accused Nike club heads do not include an aerodynamic configuration:

> Q [counsel for Nike]:  I'm asking about aerodynamic configuration for this one. It's a different claim term so I'd like to get an answer to that question and I'll restate the question. So based on this agreed definition of aerodynamic configuration do any of the Nike clubheads that are accused of infringement have that claimed aerodynamic configuration?
>
> A [Winfield]: No.

(Winfield Tr. 128:14–21)

Taking the six accused club heads one by one, Nike's counsel specifically questioned Winfield about turbulence, drag, and laminar flow. As to the SQ DYMO Quad Keel Fairway Wood, for example, the exchange went like this:

> Q: Does the slot on Nike's DYMO Quad Keel club minimize turbulence?
>
> A: No. ...
>
> Q: So you don't know whether or not the C-shaped slot reduces drag.
>
> A: No, I do not.

Q: And you don't know whether or not it increases laminar flow?

A: No, I do not.

(*Id.* at 105:24–106:1; 107:6–11) For each of the other five clubs, the answers were similar: to questions about the effect on turbulence, drag, and laminar flow, Winfield either answered no or stated that he did not know. *See id.* at 59:10–18, 60:6–61:2 (SQ DYMO Driver); *id.* at 110:22–24, 111:2–7 (SQ DYMO STR8-Fit driver); *id.* at 115:17–23, 116:1–3 (SQ DYMO2 driver); *id.* at 119:7–19 (SQ DYMO2 Quad Keel fairway wood); *id.* at 122:12–22 (SQ DYMO2 STR8-Fit driver).

Winfield sometimes qualified his admissions, stating that a particular Nike club head could "potentially" or "possibly" increase laminar flow, or "in theory" reduce drag. He could make no firm statement, however, because he had not seen any "aerodynamic data." (*Id.* at pp. 59–60, 106) Such generalized expressions of doubt do not satisfy the Rule 56 standard, described above.

The Trust does not really explain Winfield's admissions, but attempts to excuse them. Standards, it says, are lacking ("against what standard or criteria could the data of even sophisticated testing, whether by NIKE or the Trust, be applied?"). (Trust Br. at 7) Such hand-waving, particularly by the party with the burden of proof, is no substitute for evidence sufficient to create a material disputed issue.

A later declaration of Winfield, submitted in response to the summary judgment motion, contradicts his deposition testimony. Winfield testified clearly at his deposition that there was no aerodynamic configuration. *See supra.* Now, in his declaration, Winfield finds it "obvious the alleged club heads are 'aerodynamic' and have an 'aerodynamic configuration,' since they successfully competed with NIKE's peers in the industry." (Winfield Decl. ¶ 10)

Winfield's new opinion comes long after the close of both fact and expert discovery. (ECF no. 82) Were I to rely on it, in fairness I would have to reopen discovery. As it happens, however, Winfield's turnabout makes no substantive difference. It rests primarily on a rationale (that the club heads "successfully

competed with NIKE's peers") that I have rejected. *See* Section II.A, *supra* ("The Trust's 'Competitive' Standard").[3] The club heads' favorable competitive results on aerodynamic tests do not equate to an aerodynamic configuration of the c-shaped slot.

## C.   Testing

The parties agree that "[t]esting or simulation of some type is required to determine whether the accused clubs include an 'aerodynamic configuration.'" (NSMF ¶ 5; TSMF ¶ 5) The Trust produced no testing evidence of its own. Its expert, Winfield, acknowledged that he had not performed any tests of the club heads' aerodynamic qualities. (*E.g.*, Winfield Tr. 35:19–20, 61:3–22) The Trust's Rule 30(b)(6) witness similarly acknowledged that the Trust had performed no such testing. (Guerrieri Tr. at 44:6–25, 46:8–14) The Trust contends, however,

---

[3]   As a result, I do not need to reach the issue of whether this is a "sham affidavit." If I did, however, it is likely that I would disregard this affidavit.

A sham affidavit is "a contradictory affidavit solely for the purpose of defeating summary judgment." *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 251–53 (3d Cir. 2007). "A party cannot create an issue of fact by supplying an affidavit contradicting his prior deposition testimony, without explaining the contradiction or attempting to resolve the disparity." *Sinskey v. Pharmacia Ophthalmics, Inc.*, 982 F.2d 494, 498 (Fed. Cir. 1992), *abrogated in part on other grounds*, *Pfaff v. Wells Elecs.*, 525 U.S. 55, 67–68, 119 S. Ct. 304, (1998). *See Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806–07, 119 S. Ct. 1597, 1603–04 (1999) (noting "unanimity" of lower court cases on the sham affidavit doctrine). In such a case, the deposition testimony, subject to cross-examination, will be credited, and the affidavit disregarded. *See* 11 James Wm. Moore, Moore's Federal Practice § 56.14[1][f], at 56–179 (3d ed. 2004) ("If a party's deposition and affidavit are in conflict, the affidavit is to be disregarded unless a legitimate reason can be given for the discrepancies."). The trial court may "properly disregard[] [a sham] declaration in assessing the existence of a genuine issue of fact." *Sinskey*, 982 F.2d at 498. I would have no difficulty extending the doctrine to encompass a person, not technically a party, who is testifying as a paid expert.

Under the "sham affidavit" doctrine, Winfield's new opinion would not be credited absent a plausible explanation for the switch. Winfield explains his turnabout by stating that, at his deposition, the parties were using an overly narrow definition of "minimize turbulence." (*Id.* at ¶ 9) That explanation does not address the closely related but distinct subjects of drag or laminar flow. Nor does it bear a discernible connection to his current rationale: he says that the club heads must have an aerodynamic configuration because they "successfully competed with NIKE's peers," not that he has discovered something new about their minimization of turbulence. Nor is Winfield's explanation very convincing on its own terms (he calls his conclusion "obvious" but fails to account for his not having noticed it before).

that Nike's own testing of its club heads supports the Trust's position. Those tests, says the Trust, demonstrate that Nike's accused club heads are superior to the competition in terms of turbulence, drag, and laminar flow. I consider that testing evidence in the light most favorable to the Trust as opponent of the summary judgment motion. I nevertheless find it insufficient to raise a genuine, material issue of fact as to the aerodynamic configuration term or the sub-issues of drag, turbulence, and laminar flow.

### 1.   2009 testing of Nike club heads

The Trust relies on certain tests of the accused club heads in 2009. On that subject the Trust cites the testimony of Nike's expert, Clayton Long, who described those comparison tests in his deposition. (Trust Br. at 4) The Trust also cites Winfield's Declaration, discussed above. (Trust Br. at 8–9)

In his Declaration, the Trust's expert, Winfield, attempts to highlight favorable portions of the 2009 testing. (Winfield Decl. ¶ 7)

████████████████████████████████████████████

████████████████████ [4] And its relevance rests on the Trust's "competitive" standard, which I have rejected. *See* Section II.A, *supra*.

### 2.    2013 Battelle wind tunnel tests

Another set of aerodynamic tests was performed by the Battelle Memorial Institute in 2013. These tests involved a comparison between the Nike club heads as-is and with their c-slots filled in with putty. The club heads were placed in a wind tunnel at various angles, and aerodynamic drag was measured. (*See* Battelle Rpt. § 4)

The Battelle report concluded that the "groove" (*i.e.*, the c-slot) either had no effect on drag or actually increased drag:

> While it varies depending on the club and the angle of the club head with respect to the oncoming wind, ***the overall trend is that the groove either has no affect [sic] or increases drag levels.*** This trend was consistently documented when the clubs were placed in position p44 (with the exceptions of the Dymo Quad and the hybrid clubs). In general, the flow visualizations were useful in confirming the results derived from the drag measurements. They typically showed obstructed flow in addition to separated or stagnated flow. Both of these are indicators of increased drag.
>
> Further evidence of the general trend was shown when the clubs were oriented in position p54. In this position, the drag measurements indicate that there was generally no significant difference caused by the groove. The exception to this was the hybrid, which showed that the filling in the groove actually decreased drag. In general, the flow visualizations showed that there was minimal difference to the airflow around the club head while in this orientation. The flow visualizations from the hybrid did not show any indication that it should have increased or

---

4


> reduced performance with the addition of the groove, in contrast to
> the drag measurements.

(Battelle Rpt. § 5) (emphasis in original). Long, Nike's expert, considered those results to be a valid measure of aerodynamic drag (they did not directly measure turbulence or laminar flow as such). (*See, e.g.,* Long Tr. 26–41, 58–60) Long's rebuttal report contains his expert opinion that the Battelle wind tunnel test "confirms the [accused Nike club heads] do not have 'an aerodynamic configuration.'" (Long Rbtl. Rpt. at 18, 32, 42, 51–52, 60, 69–70)

The Trust criticizes the methodology of the Battelle Report. A static wind tunnel test, says the Trust, does not capture the dynamics of a golf swing. (*See* Winfield Decl. ¶ 5) Drag, turbulence, and laminar flow, according to the Trust, "could not be measured by a static test." (Trust Br. at 6) What Nike should have done, says the Trust, is perform a test with a "ball hitting machine" known as "Iron Byron." (Trust Br. at 5, citing Long Tr. 60:5–12)

The Trust again cites the new Declaration of its expert, Winfield. Winfield states that sanding the putty could have reduced drag; that the club heads were tested at only one speed, 90 mph, and in only two orientations; and that average values should have been supplemented by more sophisticated statistical analysis. (Winfield Decl. ¶¶ 3–6)

None of this advances the Trust's contention that there is infringement. If there is a better test or a better form of analysis, presumably the Trust could have performed it. The Trust cannot prevail on summary judgment by grousing that its adversary should have done a better job of proving the Trust's case. Nor can the Court simply hypothesize that the Trust's preferred tests would have produced more favorable results. At best, the Trust could be said to have undermined aspects of the 2013 Battelle wind tunnel test. That falls short of a presentation of cognizable evidence in the Trust's favor.

### D.   "Public statements in NIKE patents of which the Court may take judicial notice"

Finally, the Trust proffers three other Nike patents, "of which the Court may take judicial notice." These do not involve the accused clubs, but are said to be relevant to the aerodynamic configuration issue. (Trust Br. 4–5)

The first, U.S. patent no. 8,932,149 (the " '149 patent") dates from January 13, 2015. It is for a "Golf club assembly and golf club head with aerodynamic features." It refers to "drag-reducing structures." (Col. 5, ln. 35–43) It states that "laminar flow results in less drag" over the club head. (Col. 6, ln. 10–13) For example, the "Kammback feature, when positioned along the back 22 of club head 14, is expected to reduce turbulence flow, and therefore reduce drag due to turbulence, most significantly during the last approximately 20° of the golfer's downswing ." (Col. 9, ln. 33–37) The inventor, Andrew Oldknow, is said to be the inventor of the DYMO clubs as well, and this patent (although more recent) is apparently offered as evidence of his conception of club aerodynamics.

I may of course take judicial notice of the *existence* of a publicly filed patent. Technical arguments therefrom are another matter, and would presumably require me to reopen discovery (relief that no one has requested). Simply saying that the similarities "cannot be ignored" (Trust Br. at 9) does not advance the discussion. I consider, however, whether this proffered evidence suggests that discovery should be reopened in the interests of fairness; I find that it does not.

Winfield states, for example, in conclusory fashion that this club head has "unmistakable similarities to the DYMO." (Winfield Decl. ¶ 8) In no sense is that clear to the observer. The diagrams do not look similar; most saliently, the '149 club head design does not seem to possess the feature critical to this motion: a c-slot on the bottom surface, transecting the center line. Instead, Winfield simply states that the '149 club head's "Kammback feature" has aerodynamic qualities, and that it is "similar" to the c-slot of the Nike DYMO,

13

which must therefore also possess such qualities. That simple say-so does not square with my reading of the patent.

Oldknow's '149 patent defines an aerodynamic Kammback feature that is quite distinct from the c-slot at issue here. Laminar flow, writes Oldknow, would be maintained ideally by a club head with a long, tapering "downstream"[5] end. Where the tapering downstream end is shorter than the optimum, the flow may be improved by shearing it off. ('149 patent, Col. 9, ln. 1–15) "It is that relatively abrupt cut off of the downstream tapered end that is referred to as the Kammback feature." ('149 patent, Col. 9, ln. 15) What all of this has to do with a c-slot on the bottom surface of the club head, transecting the centerline, is not apparent.

More generally, Nike's 2015 '149 patent simply does not shed much light on the issue of whether the accused club heads fall within the scope of an aerodynamic configuration, as that term is used in the 2010 reexamination of the Trust's '754 patent. The '149 patent refers to a different Nike club head (not one of the accused clubs), and a different feature. That Kammback feature is said to have aerodynamic qualities. That contention does not elucidate the issue of whether the c-slots of the accused clubs match the aerodynamic configuration term of Claim 9 in the Trust's patent.[6]

This extrinsic patent evidence would, at best, complement direct evidence of a correspondence between the '754 aerodynamic configuration term and the design of the accused Nike clubs. In the absence of such direct evidence, this ancillary evidence does not create a genuine material issue of fact.

---

[5]   "Downstream" refers to the direction of air flow. Thus the downstream side of the club head would be the back, or trailing, side when the club is swung.

[6]   The other two patents (Winfield Decl. Exs. C & D, ECF no. 109 at 37, 44) are design patents, which define only an "ornamental design for a golf club head." *See Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*, 796 F.3d 1312, 1328 (Fed. Cir. 2015)(design patent is limited to ornamental features, and excludes features primarily dictated by function). The Trust does not dwell on them, and neither do I.

**CONCLUSION**

For the foregoing reasons, the defendant's motion for summary judgment of noninfringement (ECF no. 100) is GRANTED. An appropriate order accompanies this Opinion.

Dated:  April 20, 2016 [*redacted version filed June 2, 2016*]

_____

KEVIN MCNULTY
United States District Judge

15