UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

IRREVOCABLE TRUST of
ANTHONY J. ANTONIOUS,

        Plaintiff,

v.

NIKE, INC.

        Defendant.

Civil Action No. 11-cv-06327 (KM)

MEMORANDUM OPINION AND ORDER

**MCNULTY, District Judge**

I awarded summary judgment to the defendant, NIKE, Inc., after the close of fact and expert discovery in this patent case. Now before the court is a motion entitled "Omnibus Motion to Set Aside Agreed Claim Construction Terms (ECF no. 35) & (ECF no. 54), vacating Summary Judgment and Reopen Discovery." (ECF no. 144) This motion seeks to vacate a key claim construction agreed to in 2012 that formed the basis for the parties' and the Court's subsequent conduct of this litigation. The justification proffered is that the medical condition of plaintiff's counsel, Melvin K. Silverman, Esq., culminating in a stroke in February 2016, impaired his judgment, leading to a denial of due process. For the reasons expressed herein, the motion is denied.

**Procedural Background**

This case was filed in 2011. On September 20, 2012, the parties, in keeping with our Local Rules for patent cases, filed a joint statement, identifying those patent terms agreed upon and those in dispute. (ECF no. 35)

One of the terms agreed upon was "aerodynamic configuration." The parties agreed that "aerodynamic configuration means an aerodynamically efficient configuration which minimizes turbulence, reduces drag, and increases laminar flow around the club head when swung." (ECF no. 35 at 8

(excerpt from Ex. A, "Construction of Agreed Upon Claim Terms Pursuant to L. Pat. R. 4.3(a)"))

As to the patent terms in dispute, I convened a *Markman* hearing[1] on April 29, 2013. (The transcript is filed at ECF no. 56.) Those disputed terms were: 1. Substantially parallel with; 2. C-shaped slot; 3. Skid surface; 4. Wall separating said skid surface from said bottom surface; and 5. Offset from. The agreed-upon definition of "aerodynamic configuration" was the very foundation upon which both sides, but particularly the Trust, built their proffered constructions of the disputed terms. Mr. Silverman took particular care in his statement to that effect. *See, e.g.,* Transcript (ECF no. 56) at 6–8. (For convenience, the excerpt is attached to this opinion as an Appendix.)

In my *Markman* opinion, dated January 8, 2014, I construed the disputed patent terms. (ECF nos. 54, 55)

Fact discovery closed on February 25, 2015. (ECF no. 80) Expert discovery closed on May 7, 2015. (ECF no. 82)

NIKE then moved for summary judgment that it had not infringed. That motion focused on the single issue of whether NIKE's accused golf club heads possess the claimed "aerodynamic configuration." Construction of that term, recall, had been agreed upon in 2012, well in advance of the *Markman* hearing and the bulk of discovery in the case.

The summary judgment was fully briefed. In July and August, 2015, the Trust belatedly filed an "amended" set of papers, including a new Local Rule 56.1 statement and brief. (ECF nos. 113, 114, 117) These were not merely corrected versions; they contained wholly new facts, exhibits, arguments, and positions. The Trust did not seek leave to file these papers, or even really explain why it had done so. That alone would have been sufficient grounds to strike the submissions, but I did not strike them.[2]

---

[1] *See Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 976–79 (Fed. Cir. 1995) (en banc), *aff'd,* 517 U.S. 370, 116 S. Ct. 1384 (1996).

[2] Meanwhile, the Trust had moved to supplement its disclosures pursuant to Local Patent Rule 3.7. On October 15, 2015, Magistrate Judge Clark denied that

On March 24, 2016, plaintiff's trustee advised Magistrate Judge Clark by letter that "Melvin K. Silverman ha[d] been ill since February 17, 2016 and was unable to perform." (ECF no. 126) Attached was a letter from Mr. Silverman's doctor stating that he had suffered an "acute cerebrovascular accident[3] on 2/17/2016," had undergone heart valve surgery, and had been discharged on March 17, 2016. Judge Clark stayed pending matters until a conference call scheduled for June 1, 2016.

On April 20, 2016, I granted NIKE's motion for summary judgment. (ECF nos. 131, 132; redacted version of opinion filed as ECF no. 140) My analysis did not take the Trust's "amended" papers into account. My order stated, however, that I would entertain the Trust's motion for reconsideration to the extent those papers remained relevant:

> 2. The amended papers submitted by the Trust (ECF nos. 113, 114, 117) will not be considered, because they were filed without leave and NIKE had no opportunity to respond to them.
>
> 3. The Court will entertain a timely, succinct motion for reconsideration, see Loc. R. 7.1(i), in which the Trust may state good cause for the Court's consideration of the amended submissions, ECF nos. 113, 114, and 117. NIKE's response may address both the propriety of the submission and any new substantive arguments or factual contentions in those amended submissions. No extended citation of the standards governing motions for reconsideration is necessary.

(ECF no. 132)

---

application. (ECF no. 124) He found that the documents proffered by the Trust—for the most part relating to the "aerodynamic configuration" issue—came far too late. The Trust, he ruled, had admittedly considered the "aerodynamic" aspect even before filing the action; NIKE had fronted the issue in its initial non-infringement contentions in June 2012; the issue had again been raised in a February 1, 2013 status letter; and it had been raised again at the April 29, 2013 *Markman* hearing. By then, at the very latest, the Trust was on inquiry notice, but failed to take timely action. The Trust did not appeal Judge Clark's ruling.

As it turned out, I judicially noticed three of those documents to which the Trust directed me in connection with deciding NIKE's summary judgment motion. (ECF no. 131 at 13–14)

[3] Cerebrovascular accident ("CVA") is one medical term for what is commonly called a stroke.

3

On April 29, 2016, Mr. Silverman filed a submission stating that he was still recovering, but "expected to be able to function after the May 30, 2016 date." (ECF no. 136 ¶5) I interpreted this as a motion for an extension of time to file any motion for reconsideration. I granted the extension. (ECF no.137)

The motion now before the court (ECF no. 144) represents the Trust's response to my invitation to file a timely, succinct motion for reconsideration. It goes farther than that, however. It is entitled "Omnibus Motion to Set Aside Agreed Claim Construction Terms (ECF no. 35) & (ECF no. 54), vacating Summary Judgment and Reopen Discovery." The Trust seeks to wholly or partly set aside its own agreed construction of "aerodynamic configuration," dated September 20, 2012; the Court's *Markman* opinion, dated January 8, 2014; and the Court's grant of summary judgment, dated April 20, 2016. It also seeks to reopen fact and expert discovery.

**Discussion**

The Trust argues that the medical condition of its counsel, Mr. Silverman, resulted in its being denied due process of law. No one disputes that Mr. Silverman suffered a stroke in February 2016. I am heartened to see that he has signed off on the current motion, and I offer my best wishes for his full recovery. But I accept neither the Trust's proffered medical reasons for setting aside the agreed definition of "aerodynamic configuration," nor its substantive arguments as to that definition.

Having to some degree invited a motion for reconsideration, I will not hold the Trust to the strict requirements of Local Rule 7.1. *See North River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194, 1218 (3d Cir. 1995) (Reconsideration is granted sparingly, and only where (1) when there has been an intervening change in the law; (2) when new evidence has become available; or (3) when necessary to correct a clear error of law or to prevent manifest injustice.); *Carmichael v. Everson*, 2004 WL 1587894 (D.N.J. May 21, 2004).

Before discussing the facts underlying this due process claim, I must note that the Trust states no persuasive legal basis for its motion. The cases cited are not remotely on point; they happen to involve patents, but are pertinent here only to the extent they state generalities about due process standards. (*See* Trust Motion ¶ 4 (citing *Florida Prepaid Postsecondary Ed. Expense Bd. v. College Savings Bank*, 527 U.S. 627 (1999) (Congressional abrogation of States' immunity from action for patent infringement invalid because it was not legislation enacted to enforce the Fourteenth Amendment due process clause); *Blonder-Tongue Laboratories, Inc. v. University of Ill. Foundation*, 402 U.S. 313, 329 (1971)(collateral estoppel case involving patent, in which Court states that certain litigants who did not appear in prior action or had no opportunity to present evidence and arguments cannot be bound)). But set that aside.

The Trust does not base its due process contentions on any official action or alleged defects in the Court's procedures. Rather, it faults the conduct of its own counsel:

> Allegations of ineffective assistance of counsel, however, do not provide a basis for relief in a civil case. *In re Fleurantin*, No. 09–4376, 2011 WL 1108246, at *2 (3d Cir. Mar. 28, 2011) (citing *Link v. Wabash R.R. Co.*, 370 U.S. 626, 634 n. 10, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962)); *see also Nelson v. Boeing Co.*, 446 F.3d 1118, 1119 (10th Cir. 2006) ("The general rule in civil cases is that the ineffective assistance of counsel is not a basis for appeal or retrial.").

*Lorenzo v. Moore*, No. CIV. 06-2717, 2011 WL 2784437, at *2 (D.N.J. July 12, 2011). That is a dubious basis for a due process claim.[4] But set that, too, aside.

---

[4]   Some sort of state action is generally the *sine qua non* of a Constitutional due process claim. *Cf. Nat'l Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179, 191, 109 S. Ct. 454, 461 (1988) ("As a general matter the protections of the Fourteenth Amendment do not extend to "private conduct abridging individual rights.") (quoting *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 722, 81 S. Ct. 856, 860 (1961)). *See also Love v. Law Office of Roberts*, No. 11–4500, 2011 WL 4916196, at *2 (D.N.J. Oct.17, 2011) ("As a private attorney, Defendant Roberts is not a state actor for purposes of § 1983.") (citing *Polk Cnty. v. Dodson*, 454 U.S. 527, 535 (1981).

I nevertheless consider the Trust's contentions as a more general request to reopen or reconsider issues in the case. Those contentions, even considered on their own terms, do not justify vacating the Court's rulings, permitting the Trust to withdraw its agreed claim construction, or reopening discovery.

### A. Chronology of Counsel's medical condition

I place Mr. Silverman's 2016 stroke in the chronological context of the case:

| | |
|---|---|
| 9/30/2012 | Trust agrees to the construction of the term "aerodynamic configuration" (ECF no. 35) |
| 4/29/2013 | *Markman* hearing (Transcript at ECF no. 56) |
| 1/8/2014 | Court files *Markman* opinion (ECF no. 54) |
| 2/25/2015 | Fact discovery closed |
| 5/7/2015 | Expert discovery closed |
| 6/5 – 7/10/2015 | NIKE's motion for summary judgment of non-infringement, Trust's response, and NIKE's reply filed (ECF nos. 100, 108, 111) |
| 7/23/2015, 8/19/2015 | Trust files "amended" Local Rule 56.1 statements, brief, and exhibits in response to summary judgment |
| 2/17–3/17/2016 | Mr. Silverman hospitalized for stroke |
| 4/20/2016 | Grant of summary judgment to NIKE on issue of aerodynamic configuration (ECF nos. 131, 132) |
| 6/16/2016 | Current motion filed (ECF no. 144) |

I cannot find, as the Trust urges, that this sequence of events bespeaks a denial of due process, or justifies reopening matters agreed to by the Trust and decided by the Court. On its face, this sequence of events shows that counsel fell seriously ill in February–May 2016. I am not persuaded, however, that this 2016 illness could have had any effect on the aerodynamic configuration issue. In particular, I cannot find a basis for the Trust to withdraw its 2012 agreement that the construction of that term was undisputed—an agreement upon which four years' worth of subsequent litigation has been based.

Counsel's stroke occurred some *four years* after the parties agreed on the claim construction of "aerodynamic configuration" in 2012. That is the essential event to which the current motion is directed.

Counsel's stroke occurred over *two and one half years* after the *Markman* hearing on April 29, 2013.

Counsel's stroke occurred over *two years* after I filed my *Markman* opinion on January 8, 2014.

Counsel's stroke also occurred at least six months after the summary judgment motion (including the "amended" papers) was fully briefed. The fully briefed motion was *sub judice* from August 2015 until April 20, 2016; it was during that period that Mr. Silverman was taken ill. The motion was decided on the papers; neither counsel's health, nor anything counsel did or did not do in that *sub judice* period, could have affected my summary judgment decision.

In short, the objective evidence shows that counsel was ill and unable to act for a period of several months in the course of a five-year litigation—a not uncommon occurrence. That period, moreover, happens to have been one in which counsel was not called upon to perform any significant actions in the case.

To this chronological point, the Trust replies that Mr. Silverman's health problem, although it culminated in the 2016 stroke, was an ongoing one that affected his judgment earlier in the case. I consider the proffered evidence.

### B.  Opinion of Dr. Suite

Attached to the Trust's papers is a one-page medical opinion of Nicholas D.A. Suite, M.D., dated June 13, 2016. (ECF no. 144-1) Dr. Suite proffers a general medical opinion that the process of cerebral ischemia (decrease in blood flow to the brain) "may be sudden, or ongoing (chronic) over a period of months to years." Evidently, the Trust wishes the Court to pick the second alternative.

Dr. Suite notes the sometimes subtle prodromal warning signs of impending stroke, which may include cognitive deficits and failure to perform

tasks competently. He states that "Patients and physicians alike should be attuned to these warning signs [of stroke] if preventive measures are to be implemented." Good advice, that. Tellingly, however, Dr. Suite does not state that he has treated or even examined Mr. Silverman, in the relevant period or at any other time. Nor does he say anything about the condition of Mr. Silverman specifically. Nor does he even mention Mr. Silverman's name.

The Trust wishes the Court to conclude that Mr. Silverman was grossly impaired as early as 2012, when he agreed to the construction of "aerodynamic configuration." But it submits no medical evidence—for example, records of medical evaluation or treatment—from the relevant period. Indeed, it submits no records of treatment at all. That omission is particularly eloquent in light of the ease with which the Trust submitted the opinion of a treating physician when it suited the Trust's purposes. (*See* ECF no. 126)

### C.   Opinion of John Gillig

The Trust also proffers a declaration of John Gillig, dated June 14, 2016. (ECF no. 144-2) Mr. Gillig is a professional golfer and club designer who was "retained by [the] Trust as a consultant for the purpose of assisting in the licensing of the many patents of Antonious which were still unexpired at the time of his passing." *See* Declaration of John P. Gillig under 37 CFR 1.1328 in Support of Re-Examination Respondent/Patentee, April 20, 2009, Ex. B to ECF No. 38 ("Gillig Reexam. Decl.") (cited in *Markman* Opinion, ECF no. 54, at 16) Now Gillig adds that he has been a "client" of Mr. Silverman for 20 years. Mr. Gillig offers his observations of Mr. Silverman's medical condition, and also opines that no patent attorney "in their right mind" would have consented to the parties' agreed definition of aerodynamic configuration.

Mr. Gillig states that he has noticed that Mr. Silverman "was having difficulty focusing and confusing terms"; that he was "constantly stuttering"; that on a trip to California "approximately a year ago" (in 2015, presumably) he was very short of breath; and that he was "difficult to communicate with." At the time, it appeared to Gillig merely that Silverman had "a lot on his mind,"

but Mr. Gillig now realizes that "Mr. Silverman was having significant medical issues since at least the inception of this case."

For Mr. Gillig, Mr. Silverman conclusively demonstrated his irrationality by acting without obtaining Gillig's advice, which he says would have yielded a broader "negotiated" claim construction:

> - I do not believe that any patent attorney in their right mind would have agreed that the term aerodynamic configuration to be defined—reading the '754 Patent—as 'an aerodynamically efficient configuration which minimizes turbulence, reduces drag, and increases laminar flow around the club head when swung.' One particular telling sign of his condition, Mr. Silverman did not consult with me as his client—as he had done in the past—when negotiating the definitions for agreed claim terms.
>
> - An aerodynamic surface is simply one in which air is capable of moving across. As a client, I would have never agreed to such restrictive claim interpretation as I am aware as an ongoing inventor that claims are given their broadest reasonable interpretation.

(Gillig Decl., ECF no. 144-2, at pp. 1–2)

As lay opinion, Mr. Gillig's observations of Mr. Silverman's physical condition may have some limited validity. As an expert opinion regarding Mr. Silverman's medical condition or the adequacy of his legal representation, however, they have none. And I must read those observations in the context of the Trust's apparently purposeful refusal to submit actual, competent medical evidence of Mr. Silverman's condition in 2012–16. There is no substantial evidence that Mr. Silverman, as far back as 2012, was unable to litigate this case competently. And Mr. Gillig's appending of "since at least the inception of this case" to his general statements does not establish otherwise.

Particularly jarring is Mr. Gillig's statement that Mr. Silverman's incompetence is demonstrated because Gillig, if he had been consulted, would have advised Silverman to adopt the "broadest reasonable interpretation." Gillig's proffered definition, however—that an aerodynamic surface "is simply one in which air is capable of moving across"— is not reasonable. As NIKE

9

points out, it is close to meaningless; there is probably no "surface" on Earth that does not meet that definition.[5]

The agreed definition of aerodynamic configuration—a definition proposed by the Trust in 2012, remember—was not something the parties could freely "negotiate." It is drawn from the '754 patent specification, which of course is critical to the interpretation of the claims. For example:

> This aerodynamic surface **reduces undesirable air turbulence which causes aerodynamic drag** and **creates a smoother, laminar type air flow** around the club head.
>
> . . . .
>
> The aerodynamic surfaces of the club head create aerodynamic effects which **minimize turbulence and increase laminar air flow to reduce drag** resulting in a more stable club head with higher speed for a given application of swing force by the golfer.

('754 Patent, Col. 1, ll. 39-42; Col. 2, ll. 1-5 (emphasis added)). The language of the patent is the primary, and often the only, determinant of a claim's meaning. (See *Markman* Opinion, ECF no. 54, at 6–8, and cases cited.) And I must consider the meaning of any term in the context of the claimed invention. That air can move past the club head *at all* is both obvious and insignificant. The whole point of this invention is that air resistance and drag are minimized or reduced in some manner.

Mr. Gillig's current declaration is further discredited when it is placed alongside his 2009 declaration in support of the reexamination of the '754 patent. There, he extensively distinguished prior art and described the properties of the Antonious design. In doing so, he unfailingly used the word "aerodynamic" to signify the club head structures' reduction of drag and turbulence. I choose a few paragraphs almost at random:

> 15. . . . . Starting with function, the objective of Antonious in the club head shown in the '754 patent was to provide an aerodynamic structure upon the bottom surface of the club adjacent the rear edge of the club head to produce greater club

---

[5]   The Court is aware of only one instance of golf balls being hit outside of the Earth's atmosphere. See http://www.pga.com/news/golf-buzz/feb-6-1971-alan-shepard-plays-golf-moon.

> head speed. Antonious, like [prior art inventor] Stites, was also concerned with undesirable turbulence and its resultant aerodynamic drag, however, the structure and principles of operation of the club of the '754 patent bear little, if any, relationship to the structure and principles of operation of the Air Bear.
>
> 16.   More particularly, Antonious sought to reduce aerodynamic drag by providing a smoother, so-called laminar type of front-to-rear airflow around the club head to enable a golfer to hit balls longer and straighter. . . .
>
> 24.   In my opinion, Antonious' objective of minimizing front-to-rear turbulence and reduction of drag upon the club, while enhancing club speed and stability, could not have been achieved if his aerodynamic slot was located within any of the sidewalls or side surfaces . . . .

(Gillig Reexam. Decl. ¶¶ 15, 16, 24)

I will go no farther than to state that I consider Gillig's current position to be at best an opportunistic one, influenced by intervening events.

### D.   Mr. Silverman's Performance

Finally, I independently analyze Mr. Silverman's performance with respect to the aerodynamic configuration issue. While the Trust's position did not prevail, I saw no sign that Mr. Silverman's agreed construction of aerodynamic configuration was the product of a mental lapse. Indeed, as a concession it made a great deal of sense, if only because it was virtually dictated by the language of the patent itself. And the agreed construction carried with it certain potential strategic advantages.

Perhaps the best evidence of that is Mr. Silverman's cogent presentation of that construction at the *Markman* hearing. (*See* Appendix, attached.) This was clearly a strategic decision. The aerodynamic configuration of the club head was the foundation for the Trust's position as to other, more debatable questions of claim construction. For example, to distinguish prior art it was critical that the c-slot not extend into the sidewalls, and that it lie parallel to the club head's bottom and crown. To achieve that interpretive objective, the Trust piggy-backed on the agreed definition of aerodynamic configuration, which incorporated the concepts of minimizing turbulence, reducing drag, and

11

increasing laminar flow. Mr. Silverman relied heavily, for example, on Mr. Gillig's opinion that "the *aerodynamic objectives* of minimizing front-to-rear turbulence and reduction of drag upon the club, while enhancing club speed and stability, *could not have been achieved if his aerodynamic slot was located within any of the sidewalls* or side surfaces of the embodiments set forth in the '754 patent *or if the slot was not substantially parallel* with the bottom and crown of the club." (Gillig Reexam. Decl. ¶ 24 (emphasis added); *see* Markman Opinion, ECF no. 54, at 22–23.) Without some definition of aerodynamic configuration that incorporates reduction of drag, the argument falls apart.[6]

In sum, I have seen no argument sufficient to induce the court to press the "reset" button after five years of litigation and permit the Trust to take back a claim construction, proposed by itself and agreed to by NIKE, which formed the basis for subsequent discovery and motion practice.

**ORDER**

The plaintiff having filed a motion entitled "Omnibus Motion to Set Aside Agreed Claim Construction Terms (ECF no. 35) & (ECF no. 54), vacating Summary Judgment and Reopen Discovery" (ECF no. 144); and the defendant

---

[6] I note that a second lawyer, Mr. Sepehr Daghighian, did not formally appear on behalf of the Trust, but apparently did participate in some manner. His name is listed as of counsel, for example, in several filings involving the Trust's proposed construction of the term aerodynamic configuration: the Preliminary Claim Constructions; the signature block of the Joint Claim Construction and Prehearing Statement; Plaintiff's opening Markman Brief; and on the signature page of the Trust's brief on the motion to amend the *Markman* Opinion. (ECF no. 145-6, no. 35 at 4, no. 37, no. 57-1 at 6) Presumably Mr. Daghighian should have spoken up if no patent lawyer "in their right mind" would have proposed this construction.

Incidentally, Mr. Silverman's mental impairment, if that is what it was, would have to have extended all the way back to 2010. In October 2010, Silverman (and Daghighian) filed an Opening Markman Brief on behalf of the Trust in another case, espousing the same claim construction for "aerodynamic configuration" that was agreed to here. *See* Brief in *Irrevocable Trust v. Adams Golf*, 08-cv-03253. (A copy of the brief is attached to NIKE's motion papers in this case at ECF no. 145-4, Brief at 9.) Rather than posit that the two attorneys were not in their right minds, I find it simpler and more logical to conclude that this was, and was seen to be, the proper construction of the term.

having filed a response (ECF no. 145); and the Court having considered the submissions and reviewed the entire case file, and considered the matter without oral argument, see Fed. R. Civ. P. 78; for the reasons stated in the foregoing Opinion, and good cause appearing therefor;

IT IS this 9th day of December, 2016,

ORDERED that the Plaintiff's Omnibus Motion to Set Aside Agreed Claim Construction Terms (ECF no. 35) & (ECF no. 54), vacating Summary Judgment and Reopen Discovery" (ECF no. 144) is DENIED.

KEVIN MCNULTY
United States District Judge

## APPENDIX

From Transcript of *Markman* hearing (filed as ECF no. 56), pp. 6–8:

                                                                        p.6

. . . .

20    MR. SILVERMAN: The title of the patent states it as,
21 it is repeated on and off throughout the patent, we use this
22 term "aerodynamic". And I guess the first question that a
23 layman would have is: What does aerodynamics have to do with
24 golf clubs? It's apparent because there some common principles
25 between aviation theory and golf club theory. To make a long

                                                                        p.7

1 story short, the parties have been able to agree upon these
2 very similar definitions. The first, aerodynamic golf club
3 head. The second, aerodynamic configuration. They read almost
4 identically that they produce, as everyone agree -- aerodynamic
5 relates to air flow, characteristics of air flow.
6 So what this says is that the golf club head moves in
7 a more aerodynamically efficient fashion. And what that means,
8 in particular, is turbulence around the club head is reduced,
9 drag is reduced, and what is known as a laminar flow around the
10 golf head is enhanced, which leads to the next question. It's
11 one of the more technical issues or terms which appears in the
12 patent. What is laminar flow? We have no experts here, but I
13 believe the parties agree on what it means. It is basically
14 property of air flow to aggregate, in optimum aerodynamic
15 structure, to aggregate in layers or surfaces. And it's
16 believed that one gets a more, in this case, a more efficient
17 swing, a truer swing with the patent clubs. A good deal about
18 that, which we'll get to, of the golf club head, less
19 turbulence, vibration, et cetera, if the air moves in a more

20 layered fashion across the top, the sides, the bottom of the
21 golf club.
22    THE COURT: Uh huh.
23    MR. SILVERMAN: This, it will turn out, at least from
24 the plaintiff's perspective, is significant because we feel our
25 construction of the claims at issue are more compatible with

p.8

1 the very objective of the invention, that of producing a more
2 aerodynamically efficient golf club through the particular
3 aerodynamic configuration. And that's a lot of what this
4 hearing will be about. What is or how does one define this
5 aerodynamic configuration which appears in one form and one
6 place or another throughout the patent and the claims at issue?
7 Right below the two aerodynamic lines is the word "on".
8 Now, the parties have also agreed on that, and that's
9 perhaps worth reading. "On these located only on the bottom
10 surface/sole of the golf club head and not extending to the
11 side walls or skirt of the golf club head". Why is that
12 significant? As we will broach in further detail later in the
13 morning, this aerodynamic configuration listed right above it
14 must be on the bottom surface. Okay. Generality, in general
15 terms, the bottom surface has to somewhat surround the
16 aerodynamic configuration.